NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WILHOW CORPORATION, d/b/a Town
and Country Supermarkets,
Respondent.

No. 80–1078.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 29, 1981.

Decided Dec. 7, 1981.

J. Keith Gorham, N. L. R. B., Washington, D. C., (Robert Sewell, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, Washington, D. C., with him on the briefs), for petitioner.

Donald W. Jones, Jones, Keeter, Karchmer, Nelms & Sullivan, Springfield, Mo., for respondent.

Before HOLLOWAY and DOYLE, Circuit Judges, and KUNZIG, Court of Claims Judge.

WILLIAM E. DOYLE, Circuit Judge.

The question in this NLRB enforcement proceeding is whether there is substantial evidence on the record as a whole of a violation by the respondent Wilhow Corporation of § 158(a)(1)—interference with organizing rights—, § 158(a)(3)—discharge of employees—and § 158(a)(5) of the Act—refusal to bargain.

*Prior Proceedings*

The problem in this proceeding is that Wilhow Corporation, which operates a chain of grocery stores owned by Shirley Williams and John Howard and known as Town & Country Supermarkets, allegedly engaged in unfair labor practices at one of their stores, in Columbus, Kansas, with respect to which complaints were filed before the Board.

The Board issued a complaint against the respondent on June 30, 1977. In it a claim was made that Wilhow had violated 29 U.S.C. §§ 158(a)(1), (3) and (5) in committing unfair labor practices during an organizing campaign by the Retail Store Employees Union, Local 322 of Southwest Missouri, an affiliate of the United Food and Commercial Workers International Union, AFL–CIO. Following a hearing before an Administrative Law Judge, Wilhow was found to have violated § 158(a)(1), (3) and (5). The judge ordered that the respondent cease and desist from further violations, reinstate employees wrongfully fired and make them whole for lost pay and bargain with Local Union 322.

The Labor Board adopted the findings, conclusions and recommended order of the Administrative Law Judge.

All of the proceedings mentioned above started to take form in April 1977 when Stanley Robinson, assistant manager at the Columbus, Kansas store, contacted a union representative of Local 322 and requested a meeting between store employees and the union to discuss union representation. Such a meeting was held on May 5th between eight employees of Town & Country Supermarkets and the Union representative. These eight employees signed authorization cards requesting that the Retail Clerks International Association, AFL–CIO, represent them "for the purposes of collective bargaining, respecting rates of pay, wages, hours of employment or other conditions of employment in accordance with applicable law." Four additional store employees signed authorization cards on the sixth and seventh of May. On May 6 the Union sent a demand to Wilhow demanding recognition and bargaining. A claim was made that the Union represented a majority of employees in the grocery department of the Columbus store. Copies of the authorization cards were included with the letter. The Company received the Union's letter on May 7th and replied by a letter dated May 9th in which it refused to recognize the Union without a secret ballot. Wilhow did not believe that a majority of their grocery employees freely signed the authorization cards. On May 9 the Union filed an election petition with the Regional Director of the NLRB. On May 11 the Union filed an unfair labor practice charge with the Regional Director.

Evidence here is quite extensive. The hearing commenced September 29, 1977 and continued to December 1, 1977 before the Administrative Law Judge.

*Testimony on Wilhow's Alleged Interference with the Employees' Right to Organize*

The finding by the judge was that Roger Box, manager of the Columbus store, had questioned Mitchell Reese, an employee who had signed an authorization card. The questioning occurred during the week of May 9th having to do with his union activity but without using the term union in the conversation. More questioning about the attempted unionizing occurred through Paula Box, Roger's wife and the bookkeeper at the store. In February of 1977 Mrs. Box told Reese that John Howard, one of the owners, would close the store if the Union was successful and advised him to be wary of speaking about unionizing while at

work. Later, on May 7th, Mrs. Box arranged a meeting with the mother of employee Alan McClure, who had signed an authorization card. She asked Mrs. McClure if she knew of the Union's recent activity. Paula Box advised Mrs. McClure that if the Union was successful some employees would lose their jobs because Wilhow would be forced to pay higher wages. This conversation was relayed by Mrs. McClure to her son. The following day Mrs. Box made similar statements to employee Debra Jackson, who had signed an authorization card. She told her that since she was the last one hired she would be the first to go. On May 10th Paula Box made a veiled threat to Alan McClure, who was a part-time employee. She said that, if unionized, the company would dispense with most part-time help in favor of permanent employees.

The owners of the store participated in soliciting complaints from employees subsequent to the Union's demand for recognition. The Administrative Law Judge found that on May 14th Shirley Williams, one of the owners, asked McClure if he knew there had been talk of unionizing. He told McClure that he would be around the store if employees wanted to discuss anything with him, including any problems they might have. On May 26th John Howard asked Stanley Robinson "how we got into this mess ... and what can we do to get out of it." A further conversation occurred on May 31st between Howard, Williams and Robinson. Robinson volunteered information about the employees' unhappiness with Paula Box's power over them. Following this conversation, Mrs. Box's desk was enclosed from the main part of the store and a diagram of responsibilities was drawn up.

On May 7th Williams promised an enticement to some of his employees. He told them that there had been trouble in the store, an obvious reference to the Union's bargaining demand, and that he owned an auto race track that they could get into free by arranging a Sunday off through Roger Box.

*The Evidence Having to do With the Discharge or Firing of Employees.*

On May 7th Roger Box told Karlinger, the produce manager, that John Howard had fired him. Karlinger attended the Union meeting on May 5th, signed an authorization card, and on May 6th at the store asked a fellow employee if she knew about or was interested in the Union's efforts. At that time no warning was given to Karlinger that he was going to be terminated. The only reason given to him for his firing was that the gross profits of his department was five percent below the Company's average. At the hearing, however, John Howard testified that there were legitimate reasons for firing Karlinger unconnected with his Union activities: ordering problems, uncleanliness of his department, and displays in poor condition. The ALJ discounted Howard's testimony as vague and unresponsive. He found that it stretched credulity to believe that Karlinger's termination merely coincided with the receipt of the Union's bargaining demand (and was not connected with it).

Employee Jim Mogle was released from duty on May 7th. He had participated, as had Karlinger, in the Union activities. Roger Box kept notes for the prior six months on Mogle's shortcomings. He, however, received no advance warning that he would be fired. The Company claimed that he was fired for his poor job performance. Howard testified to this and claimed that Mogle had a poor attitude, that he had failed to follow directions and failed at his housekeeping tasks. The ALJ found Howard's testimony unbelievable and vague and lacking in substance. It was disregarded.

*The Testimony Having to do With Refusal to Bargain*

The Administrative Law Judge determined that the grocery employees who demanded collective bargaining through the Union's letter of May 6th comprised an appropriate bargaining unit. The Administrative Law Judge included seventeen employees in the unit. As of May 7th, when

Wilhow received the Union's letter, twelve employees had signed authorization cards. Accordingly, a card-bargaining majority existed. However the Company questioned the manner in which the Union representative waived Union initiation fees for those signing cards. The judge found that there was no evidence that the Union told employees that only those who signed up before the election would receive the waiver. *See, NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) where the Court held that a bargaining order should not be enforced if the Union entices employees to sign authorization cards by telling them that only those who sign up before an election will have their initiation fee waived.

Wilhow complained that a letter dated September 2, 1977 sent to the Union, the Board and the Company by six of the twelve employees who had signed cards was probative. This letter stated that those employees no longer wanted an election, did not believe Wilhow had violated the National Labor Relations Act and did not wish to testify. The Administrative Law Judge disregarded this letter for it was written after the unfair labor practice had occurred. In determining that a bargaining order was appropriate, the Administrative Law Judge gave weight to the unlawful firings. These violations, together with the § 158(a)(1) violations, were considered to undermine the majority of the bargaining unit and impede the Board's election process. The judge ruled that the § 158(a)(1) violations were coercive enough to persist and because a majority of the bargaining unit had signed authorization cards, a bargaining order was consistent with *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

## Review of Violations Found by the Board

■ We are called upon to review the record as a whole for the purpose of ascertaining whether there is substantial evidence supporting respondent's violations of § 158(a)(1), (3) and (5). Our scope of review pursuant to 29 U.S.C. § 160(e) is a limited one. We do not, of course, retry the proceedings before the Administrative Law Judge or those before the Board. We do not weigh the credibility of one witness against another and we do not search for contradictory inferences.[1] We are not authorized to make contrary alternative inferences from the record evidence where there is substantial evidence to support the Board's determination. *Montgomery Ward, supra.* We do not have a broad discretion to overturn the NLRB on factual issues. Indeed our authority is narrower than the Board's in its consideration of the findings of the Administrative Law Judge.[2] The fact that this court differs with the Board does not justify setting aside the findings of the Board where the facts lend themselves to conflicting inferences. This is true even though the court would have reached a different conclusion had the matter been before it at the trial level.[3]

■ As to the § 8(a)(1) violations, the Administrative Law Judge heard a good deal of testimony on the statements made by Roger Box, Paula Box, John Howard and Shirley Williams, to employees participating in the organizing effort. His conclusions based on the credibility of employees Reese, McClure, Jackson and Robinson were supported by substantial evidence in the record as a whole. Credibility determinations are particularly within the province of the hearing examiner and the Board, and

---

1. *NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 999 (10th Cir. 1977); *NLRB v. Central Machine & Tool Co.*, 429 F.2d 1127, 1129 (10th Cir. 1970), *cert. denied*, 401 U.S. 909, 91 S.Ct. 870, 27 L.Ed.2d 807 (1971).

2. *U. S. Soil Conditioning v. NLRB*, 606 F.2d 940, 944 (10th Cir. 1979).

3. *NLRB v. Automotive Controls Corp.*, 406 F.2d 221, 226 (10th Cir. 1969). *See, NLRB v. Okla-Inn*, 488 F.2d 498 (10th Cir. 1973).

these are generally entitled to affirmance on review.[4]

It is noted that the Administrative Law Judge's tendency was to find the testimony of the unionizing employees more believable and forthright than that of Williams and Howard. Wilhow has attacked the Board's decision claiming the Administrative Law Judge acted arbitrarily in refusing to give credence to the Company's testimony. "Merely because the Administrative Law Judge believed the employee's story does not furnish reasons to overturn his credibility determinations."[5] In order for the court to accept the findings of the Administrative Law Judge it is sufficient for this court that the judge advanced plausible reasons for his credibility findings.[6]

■ We are of the opinion that the Administrative Law Judge was fully justified in determining that the interrogations by the Boxes and the co-owners Williams and Howard were coercive, threatening and restrained unionizing activity.[7] It is primarily the Board's function to decide if interrogation violates the Act and where there is substantial evidentiary support this court will not disturb the ruling.[8] It is within the Board's competence to judge the·

impact of the statements made on behalf of the Company within the employer-employee relationship.[9]

■ It is the contention of the respondent that no violations can arise out of the interrogations by Paula Box for the reason that she is not a supervisor under § 2(11) of the Act but rather just another employee. The judge did not reach the question of Mrs. Box's supervisory status. He held that she was sufficiently allied with the Company's Columbus store management to make her its representative.[10] The Administrative Law Judge considered the small number of employees at this store, the fact that Paula Box was married to the store manager and her visibility and role in store operations in entering the determination. There is no necessity for formal supervisory status in order to have employer responsibility. The court will look to whether the employee had justifiable cause to believe that the individual was acting on behalf of management when he performed the acts complained of.[11] In this setting the court must pierce the doctrines of *respondeat superior* to determine whether there is present employer domination or influence.[12] In *Champa Linen* there was a question of

---

4. *NLRB v. Wylie Manufacturing Co.*, 417 F.2d 192, 194 (10th Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970); *American Sanitary Products Co. v. NLRB*, 382 F.2d 53, 55 (10th Cir. 1967); *NLRB v. United Nuclear Corp.*, 381 F.2d 972, 976 (10th Cir. 1967).

5. *NLRB v. Pepsi-Cola Bottling Co. of Topeka*, 613 F.2d 267, 271 (10th Cir. 1980).

6. *NLRB v. Dillon Stores*, 643 F.2d 687, 692 (10th Cir. 1981); *Osteopathic Hospital Foundation Ass'n. v. NLRB*, 618 F.2d 633 (10th Cir. 1980).
 In the case of *NLRB v. Dinion Coil Co.*, 201 F.2d 484, 490 (2nd Cir. 1952) Judge Frank stated that a reviewing court will not upset the Board's decision:
 when it accepts a finding of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness's demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible or flatly contradicts either a so-called 'law of nature' or undisputed documentary testimony.

7. *See, NLRB v. Gold Spot Dairy, Inc.*, 417 F.2d 761, 762 (10th Cir. 1969).

8. *NLRB v. Miller Trucking Service*, 445 F.2d 927, 931 (10th Cir. 1971); *NLRB v. Thompson Transport Co.*, 406 F.2d 698, 702 (10th Cir. 1969).

9. *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469, 479, 62 S.Ct. 344, 349, 86 L.Ed. 348 (1941).

10. 244 NLRB 303, 306 (1979).

11. *Betts Baking Co. v. NLRB*, 380 F.2d 199, 202 (10th Cir. 1967).

12. *NLRB v. Champa Linen Service Co.*, 324 F.2d 28, 30 (10th Cir. 1963) (quoting *International Association of Machinists v. NLRB*, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940)).

whether the sons of the general manager were properly considered by the Board and this court to be agents of management in committing violations of § 8(a)(1). It is our determination that Mrs. Box's affinity with management was sufficient to attribute her actions to the respondent.

Turning now to the firings of Karlinger and Mogle, the respondent's complaint is that, contrary to the finding of the Administrative Law Judge, those employees were supervisors within the meaning of § 2(11) and are not protected under the Act.[13] The Board's decision on supervisory status is conclusive if supported by substantial evidence.[14] The decision here being factual, especially within the competence of the hearing examiner and the Board, it is entitled to even greater than usual weight.[15] The record shows that Karlinger worked alone as produce manager and had no authority over others. The same is true of Mogle as a stocker. He did not have the indicia of supervisory status. He could request that other employees help him when they were free, but he did not have authority over them beyond those occasions when they wished to be cooperative. Accordingly, the Board's view that neither of these men comes within the statutory definition of supervisor must be upheld.[16]

Wilhow also challenges the § 8(a)(3) violation on another ground. The claim is that Howard and Williams lacked any knowledge of Karlinger and Mogle's Union activities at the time of their termination. The contention is that they were fired for reasons other than Union activity, reasons having to do with their performance.

In the first instance the General Counsel has the burden of proving a violation of § 8(a)(3). This must be established by acceptable substantial evidence on the whole record that the discharge comes from the forbidden motive of interference in the employee's statutory rights.[17] Thus, if the employer comes forward with evidence of a motive for the firing devoid of Union animus, it is incumbent on the General Counsel to demonstrate explicitly that an improper motive contributed to the discharge.[18] To accomplish this burden it is necessary to have proof of an employer's knowledge of his employee's Union activity.[19] John Howard points out that the Company failed to receive the Union's letter requesting Town & Country Supermarkets to bargain until after the firing of Karlinger and Mogle on May 7th. However, the record as a whole contains sufficient circumstantial evidence that Howard knew of the Union activity of these employees on the 5th and 6th of May and along with any business-related complaints he had, their Union activities brought about their termination. It is unnecessary here for the Board to prove beyond a reasonable doubt that Howard was completely aware of the discharged employees' involvement, where, as here, the record in its entirety allows a fair inference of discriminatory motivation.[20] Circumstantial evidence of the employer's knowledge and motive is sufficient to prove a § 8(a)(3) violation. *NLRB v. Link-Belt Co.*, 311 U.S.

13. See *NLRB v. North Arkansas Electric Cooperative, Inc.*, 446 F.2d 602, 610 (8th Cir. 1971).

14. *NLRB v. Dadco Fashions, Inc.*, 632 F.2d 493, 496 (5th Cir. 1980); *Sweeney & Co. v. NLRB*, 437 F.2d 1127, 1131 (5th Cir. 1971).

15. *NLRB v. Stark*, 525 F.2d 422, 431 (2nd Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976).

16. *NLRB v. Little Rock Downtowner, Inc.*, 414 F.2d 1084, 1089 (8th Cir. 1969).

17. *NLRB v. Okla-Inn*, 488 F.2d 498, 506 (10th Cir. 1973); *NLRB v. McGahey*, 233 F.2d 406 (5th Cir. 1956).

18. *M.S.P. Industries, Inc. v. NLRB*, 568 F.2d 166, 173 (10th Cir. 1977) (quoting *Cain's Coffee Co. v. NLRB*, 404 F.2d 1172, 1175–76 (10th Cir. 1968).

19. *NLRB v. Dillon Stores*, 643 F.2d 687, 692 (10th Cir. 1981); *Bill's Coal Co. v. NLRB*, 493 F.2d 243, 246–47 (10th Cir. 1974).

20. 488 F.2d at 506.

584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941). The testimony of Howard and that of Roger Box concerning the shortcomings of Karlinger and Mogle would be sufficient to support the Board had it failed to find a § 8(a)(3) infraction. However, we cannot substitute our judgment for that of the Board if there is a reasonable basis in the record as a whole for its determination. The inference of unlawful discrimination in the firing of employees involved in Union activity is sustainable on the record before the court.[21]

We conclude the employer's rationale for its action has included a pretext to mask anti-union motivation. Beyond the Union activity of Karlinger and Mogle, we are unable to ignore the fact that they were fired the day after the Union's collective bargaining request was sent and two days after the Union organizing meeting. Neither employee had ever been warned that they would be fired at any time prior to May 7th. Certainly the timing of events is an important factor in determining the validity of an inference that there has been a discriminatory firing.

Where, as in this case, the employer has committed unfair labor practices with respect to a majority of employees signing Union authorization cards, we have recognized the propriety of a bargaining order.[22]

A fundamental decision of the Supreme Court on the propriety of a bargaining order is *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Court in *Gissel* emphasized the wide discretion the Board has in fashioning its remedies and concomitantly the special respect reviewing courts must give the Board's choice of remedies. 395 U.S. at 612, n. 32, 89 S.Ct. at 1939, n. 32. "[T]he Board, through its expertise, must estimate the effects on the election process of unfair labor practices of varying intensity." *Id.* This court's function in reviewing the Board's orders is to uphold them "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). In the Tenth Circuit we have indicated clearly that the Board has great latitude in determining whether an employer's unfair labor practice vitiates a fair election process, and thus, requires a bargaining order based on a majority of Union authorization cards.[23]

As to the § 8(a)(5) violation, Wilhow claims that it was justified in refusing to bargain; that it did not violate § 8(a)(5), and that a bargaining order is inappropriate because it in good faith doubted that a majority of its employees in the grocery department had signed authorization cards. Also challenged by Wilhow before the Regional Director, the hearing examiner and this court is the make-up of the bargaining unit. Our holding is that the Administrative Law Judge's inclusion of seventeen employees in the bargaining unit is within the informed discretion of the judge and the Board. We see no reason to disturb this finding.[24] Wilhow's alleged good faith is a subjective consideration which is no longer relevant in determining

---

**21.** *NLRB v. Automotive Controls Corp.*, 406 F.2d 221 (10th Cir. 1969).

**22.** *Furrs, Inc. v. NLRB*, 381 F.2d 562 (10th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967). "[I]t is well established that an election is not the exclusive instrumentality by which a union's representative status may be established." *James H. Matthews & Co. v. NLRB*, 354 F.2d 432, 436 (8th Cir.), cert. denied, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966).

**23.** *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739, 743 (10th Cir. 1976); *NLRB v. Okla-Inn*, 488 F.2d 498 (10th Cir. 1973); *NLRB v. Wylie Manufacturing Co.*, 417 F.2d 192 (10th Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970).

**24.** *Packard Motor Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *Mountain States Telephone & Telegraph Co. v. NLRB*, 310 F.2d 478 (10th Cir. 1962).

the propriety of a bargaining order. The Board had said in *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), enforced, 185 F.2d 732 (D.C.Cir.1950), that an employer's good faith doubt of majority status was a defense to a demand to bargain. The Board gave up this position by the time of *Gissel*. "[U]nder the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election process and tend to preclude the holding of a fair election." 395 U.S. at 594, 89 S.Ct. at 1930. The courts have upheld the Board's current position. *Linden Lumber Division v. NLRB*, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974); *NLRB v. American Cable Systems*, 414 F.2d 661, 667 (5th Cir. 1969).

 Wilhow, again in this connection, reasserts its claim that Stanley Robinson was a supervisor under § 2(11) and that his participation in soliciting signatures for the authorization cards taints their usefulness. True, both the courts and the Board agree that if a supervisor is a moving force in obtaining authorization cards, they are invalid.[25] In this case, though, the Administrative Law Judge and the Board determined that Robinson was not a supervisor. There are numerous findings as to his duties with Town & Country Supermarkets. The judge held that Robinson's position was actually that of a grocery clerk. He had tasks of some responsibility assigned to him, but he was not authorized to use independent judgment in dealing with other employees or his job performance. The cases cited in regard to Karlinger's and Mogle's status, *supra*, uphold the Board's determination of Robinson's position. *See, NLRB v. Robin American Corp.*, 654 F.2d 1022 (5th Cir. 1981).

 The Company complains that the authorization cards were signed only to get an election and are, therefore, invalid. In *Gissel* the Supreme Court recognized the Board's decision in *Cumberland Shoe Corp.*, 144 N.L.R.B. 1268 (1963), that if a card states that the signer authorizes the Union to represent an employee in collective bargaining and not to seek an election, the card will be counted. It is only if the employee was told the card was to be used solely to seek an election that it will be invalid. "There is nothing inconsistent in handing an employee a card that the signer authorizes the Union to represent him and then telling him that the card will probably be used first to get an election." 395 U.S. at 606–07, 89 S.Ct. at 1936–1937. The cards used by Local 322 in this case were unambiguous single-purpose cards for collective bargaining. The record does not reflect that there was any misrepresentation by the Union representative or by Stanley Robinson to any of the twelve signatories. No one was told the cards would be used *solely* to gain an election. Therefore, we find that there is no fault to be found with the cards evidencing the wish of a majority of the bargaining unit.[26]

 The Company also attacks the validity of the cards on the ground that the Union representative told the employees that the Union would waive the initiation fee if they signed authorization cards before the election. In the Supreme Court's decision in *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), the Court stated that a bargaining order would not be enforced if the Union lured employees by telling them that only those who signed cards before an election would have their initiation fees waived. The record on this matter supports the conclusion that Union representative Conyers never told these employees that only if they signed before an election would the initiation fee be waived.

---

**25.** *NLRB v. Hawthorne Aviation*, 406 F.2d 428, 430 (10th Cir. 1969).

**26.** *NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 1003 (10th Cir. 1977); *J. P. Stevens & Co.,*

*Guliston Division v. NLRB*, 441 F.2d 514, 523 (5th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971).

*What is the Effect of Post Violation Occurrences on the Bargaining Order?*

■ Six of the twelve employees who signed authorization cards sent a letter on September 2, 1977 to respondent, the Union and the Regional Director in which they retracted their desire to have the Union represent them in collective bargaining. The Board considered this letter to be of no significance in contemplating the bargaining order remedy. Respondent maintains that a bargaining order under these facts would be contrary to the § 7 rights of the current employees. The Board found that this employee retrenchment was a product of Wilhow's unlawful conduct and is not entitled to credence. This circuit has had this question before it in the past and concurs with the Board's views. *NLRB v. Wylie Manufacturing Co.*, 417 F.2d 192, 195 (10th Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970).

Wilhow finds fault with the bargaining order on another ground, to-wit: the order serves no purpose and injures the § 7 rights of the current employees when out of the twelve employees signing cards only one is presently employed.

The issue of employee turnover in determining whether to enforce a bargaining order is a question of timing—whether this court will look to the nature of the work force after a majority of employees in the bargaining unit have given the Union their support. The Board's position has been

that employee turnover does not warrant withholding a bargaining order; the validity of such an order depends on evaluating the situation as of the time of the unfair labor practices.[27] The court in *Gissel* indicated that a bargaining order remains an appropriate remedy even when the Union has not been able to maintain its majority status. 395 U.S. at 610, 89 S.Ct. at 1938. *See NLRB v. Katz*, 369 U.S. 736, 748, n. 16, 82 S.Ct. 1107, 1114, n.16, 8 L.Ed.2d 230 (1962); *Franks Brothers Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).[28] An unlawful termination of an employee under § 8(a)(3) may raise a question in determining whether a fair election can be held. In *NLRB v. Jamaica Towing Co.*, 632 F.2d 208, 214 (2nd Cir. 1980), the court stated that "employee turnover and lapse of time may . . . become major factors in close cases." Unlike the case that is cited, the § 8(a)(3) violations that Wilhow is guilty of do not make for the type of close case contemplated by the Second Circuit.

*Is A Bargaining Order Proper on the Facts in this Case?*

■ It is unquestioned that respondent refused to bargain with Local 322 when it received the Union's letter of May 6th. We have upheld the Administrative Law Judge's determination that as of May 7th a majority of grocery department employees supported the Union's effort. Accordingly, Wilhow's actions in refusing to bargain violated § 8(a)(5).

---

27. *Highland Plastics, Inc.*, 256 N.L.R.B. No. 28 (May 26, 1981).

28. In examining the views of other circuits the majority approve of the Board's position. *United Dairy Farmers Cooperative Association v. NLRB*, 633 F.2d 1054 (3rd Cir. 1980); *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503 (7th Cir. 1980); *NLRB v. Dadco Fashions, Inc.*, 632 F.2d 493 (5th Cir. 1980); *Chromalloy Mining and Minerals v. NLRB*, 620 F.2d 1120 (5th Cir. 1980); *NLRB v. Dixisteel Buildings, Inc.*, 445 F.2d 1260 (8th Cir. 1971); *J. P. Stevens & Co., Gulistan Division v. NLRB*, 441 F.2d 514 (5th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); *NLRB v. Lou de Young's Market Basket, Inc.*, 430 F.2d 912 (6th Cir. 1970); *NLRB v. L. B. Foster Co.*, 418

F.2d 1 (9th Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970); *Superior Engraving Co. v. NLRB*, 183 F.2d 783 (7th Cir. 1950), *cert. denied*, 340 U.S. 930, 71 S.Ct. 490, 95 L.Ed. 671 (1951). Several courts, however, have struck the balance between the deterrent effect of a bargaining order and the wishes of the current employees on the side of those employees. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35 (D.C.Cir.1980); *NLRB v. Peninsula Association for Retarded Children and Adults*, 627 F.2d 202 (9th Cir. 1980). Both of these cases are distinguishable on their facts from the case before us. It is significant that in neither of these decisions was there a § 8(a)(3) violation as is present here.

We have upheld violations of § 8(a)(1)(3) and (5) in this matter and consider the appropriateness of a bargaining order on respondent. The Supreme Court's view in *Gissel* was that there must be a showing that at one point the Union had a majority and the Board must determine

> the extensiveness of employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. ·

395 U.S. at 614, 89 S.Ct. at 1940.

In reviewing the present record it is noted that the Administrative Law Judge considered the possibility of erasing the effects of the violative actions and of ensuring a fair election in making his remedial order. This is not a case like *NLRB v. Miller Trucking Service*, 445 F.2d 927 (10th Cir. 1971), where the Board made no specific findings on the "extensiveness of the employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future."

However, the behavior of the respondents here comes within the second category described in *Gissel* where there are less extraordinary and less persuasive practices than are sometimes found but still warrant a bargaining order under the Board's discretion. The unfair practices here might seem a close question to some but we cannot substitute our judgment for that of the Board. We recognize that a small plant is involved here and this helps tip the balance. *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739, 743–44 (10th Cir. 1976). Certainly

the individuals involved in this case were adamant in their attitude toward bargaining and they showed no indication to comply with the law. This to us is additional reason for upholding the order that was issued.

The Second Circuit in *Jamaica Towing* spoke of bargaining orders based on "hallmark violations," that is to say those practices which are highly coercive and which will support a bargaining order. The loss of employment due to union activity is such a hallmark violation, which has a residual effect on employees and taints the possibility of a free election. 632 F.2d at 212–13; *see also, Coating Products, Inc. v. NLRB*, 648 F.2d 108 (2nd Cir. 1981). The firing of Karlinger and Mogle lends support to the potentially lingering effects of the respondent's behavior and the difficulty of having a fair election.

There are two other brief points which have been raised by Wilhow. It is contended that the hearing examiner's failure to sequester Karlinger and Mogle during the hearing constituted reversible error. The answer to this is that the Administrative Law Judge has authority to sequester witnesses. The fact that he did not is not necessarily reversible error, where apart from the testimony of the unsequestered witnesses the hearing examiner is on solid ground in his credibility findings.[29]

Wilhow has also complained that the Administrative Law Judge was prejudiced and biased against Wilhow in his handling of the case. The Board found no evidence of this and neither do we. This claim is prompted by the fact that the Judge found the employees to be more credible witnesses. This claim will not support overturning these findings.[30]

The order of the National Labor Relations Board should be and the same will be enforced.

**29.** *NLRB v. Stark*, 525 F.2d 422, 431 (2nd Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976).

**30.** *NLRB v. Pepsi-Cola Bottling Co. of Topeka*, 613 F.2d 267, 271 (10th Cir. 1980).