**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

MIDNIGHT ROSE HOTEL &
CASINO, INC.,

      Petitioner / Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent / Cross-Petitioner.

No. 05-9502 & 05-9509
(National Labor Relations Board)
(No. 27-CA-17885-1)

_____

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

Midnight Rose Hotel & Casino, Inc., operates three casinos in Cripple

Creek, Colorado, including the Midnight Rose. The National Labor Relations

Board (NLRB) found the Midnight Rose violated Section 8(a)(1) of the National

Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, by threatening and

interrogating employees with respect to union organizing activities. The NLRB

also found the Midnight Rose violated Section 8(a)(3) and (1) by discharging one

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, res judicata and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

of its employees, Maureen Ostler, for engaging in union activities. The Midnight Rose petitioned this Court to set aside that portion of the Board's order dealing with Ostler's termination; the NLRB cross-petitioned seeking enforcement of the order.[1] Exercising jurisdiction under 29 U.S.C. § 160(f), we affirm the NLRB's decision and order enforcement of its decision.

## Background

Maureen Ostler began working at the Midnight Rose as a food service waitress in 2000. Several months later, she became a bartender. In mid-November 2001, Ostler and co-worker April Hendricks, who worked as a cocktail waitress, discussed temporarily exchanging positions when they worked the same shift. Although the rate of pay for the two jobs was different ($5.50/hour for a cocktail waitress, $6.75/hour for a bartender), the women were looking for variety in their work. The pay differential was not significant to the women, since the majority of income from either position came from customer gratuities.

After obtaining permission from their supervisor, Shelby Moon, the women implemented their switch on November 17, 2001. Ostler arrived at the casino and clocked in as a cocktail waitress, which required entering a new code into the time clock (which would otherwise default to an employee's usual job code - in Ostler's case, a bartender). Over the next three months, Ostler worked forty-

---

[1] The Midnight Rose did not file exceptions to those portions of the administrative law judge's decision concerning the § 8(a)(1) issues and they are not part of this appeal.

seven more shifts as a cocktail waitress. On those shifts, however, she did not clock in as a cocktail waitress; rather, the time clock defaulted to the bartender code (and corresponding rate of pay).

In January 2002, Dean Modecker, an organizer from Teamsters Local Union No. 537, began working with Patricia Donch, a blackjack dealer at the Midnight Rose, regarding union organization efforts at the casino. A previous effort had failed in 1998. Donch asked Ostler to become involved as well. On January 16, Modecker sent a letter to Richard Wenschlag, general manager of the Midnight Rose, informing him the union was beginning another organizing effort and identifying Donch as the leader of the campaign.

In the course of soliciting support for the organizing campaign, Ostler talked with fellow bartender Trent Costello. Costello sought input from his girlfriend Brenda Franco, a blackjack dealer. Franco in turn spoke with her friend and supervisor, Rebecca Vandiver, seeking her opinion. Vandiver told Franco the previous campaign had been a "nightmare" and advised her to stay out of it. (R. Vol. I at 217.) Vandiver also told Franco people had been laid off during the previous campaign and Wenschlag would likely close the blackjack pit if the organizing efforts materialized. The next day, Vandiver contacted Franco and asked who had approached Costello about the union efforts; Franco identified Ostler.

Around the same time, Moon asked one of her employees, Randi Carroll,

whether she had witnessed any union activity in her area. Carroll, a blackjack dealer, said she had been aware of activity for about three months. Moon expressed dismay at the information, articulated her personal anti-union sentiments, and mentioned a former employee, Sabrina Newberry, as someone who had suffered negative consequences because of her pro-union beliefs. Moon also spoke with Michael Martinez, a shift manager, observing that Ostler seemed to be spending a lot of time at the end of the bar conversing with employees. Moon thought this might be a sign Ostler was acting as an organizer.

Sometime between mid-January and early February, Wenschlag contacted another blackjack dealer, Mark Shibe, and asked him to talk with Ostler to see if she would confirm that union activities were occurring at the casino. Shibe did so, but to no avail.

On February 12, Wenschlag closed the blackjack pit. Donch was laid off as a result of the closure.[2]

The same day, Moon returned to the casino after a two-week vacation and conducted a payroll audit, during which she scrutinized time clock records including job codes and pay rates. She discovered job code entries were missing next to Ostler's name, indicating Ostler had, except for one occasion on

---

[2] The union's original unfair labor practice charge alleged the closure violated Section 8(a)(3). That allegation did not appear in the subsequent amended charges and was not litigated further.

November 17, been clocked in as a bartender, and thus had received the bartender's higher hourly wage even when working as a cocktail waitress. Hendricks, on the other hand, had never clocked in as a bartender, even though she had in fact switched jobs with Ostler on many occasions, and thus continued to be paid at the lower waitress rate.

Moon immediately contacted Wenschlag. They decided Ostler had committed a terminable offense. On February 13, Rick Pratt, the food and beverage manager, called Ostler at home and told her she was being terminated for theft. Ostler asked if her final paycheck was ready; when told that it was, she arranged to come into the casino to pick it up. While there, she met with Mark Lockwood, the human resources manager, and other management personnel. Ostler denied she had stolen anything. She did admit, however, she knew she was being overpaid. When asked, she demonstrated she knew how to clock in with the proper job code. She also stated she believed her termination was union-related, a contention she repeated in a meeting with Wenschlag two days later.

Once Ostler was discharged, the union had no organizers inside the casino, bringing the organizing campaign to an end.

On February 28, 2002, Teamsters Local Union No. 537 filed an unfair labor practice charge against the Midnight Rose, which charge was amended twice. On April 16, a complaint was issued by the NLRB's Regional Director. The complaint alleged the Midnight Rose violated Section 8(a)(3) and (1) of the

National Labor Relations Act by engaging in a prohibited response to union organizing and by discharging Ostler for participating in organizing activities.[3]  A hearing was held on June 18 and 19, 2002, before an administrative law judge (ALJ).  On December 16, 2002, the ALJ issued his decision.  He found the Midnight Rose had violated Section 8(a)(1) when its managers and supervisors interrogated employees about union activities, threatened them, and solicited an employee to spy on Ostler.  He also found the casino had violated Section 8(a)(3) and (1) by discharging Ostler.  The ALJ ordered the Midnight Rose to cease and desist from its activities, post a notice at its casinos concerning the violation, and reinstate Ostler with back pay and restoration of seniority.

The Midnight Rose filed exceptions only to that portion of the decision regarding Ostler's discharge.  A three-member panel of the NLRB issued its order on December 16, 2004.  A majority of the panel affirmed the ALJ's decision and adopted the recommended order.  One member of the panel dissented.  *Midnight*

---

[3] 29 U.S.C. § 158(a) provides in pertinent part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

-6-

*Rose Hotel & Casino, Inc.* (*Midnight Rose*), 343 N.L.R.B. No. 107 (2004).

On January 11, 2005, Midnight Rose filed a petition for review with this Court. The NLRB cross-petitioned on February 22, 2005, seeking enforcement of the order.[4]

## Discussion

1. Ostler's discharge - substantial evidence

"Section 10 of the NLRA, which grants this Court jurisdiction to consider [petitions for review of NLRB decisions], requires that 'the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.'" *Double Eagle Hotel & Casino v. NLRB*, 414 F.3d 1249, 1252 (10th Cir. 2005) (quoting 29 U.S.C. § 160(e)), *cert. denied*, 126 S.Ct. 1331 (2006). Our "review of the Board's factfinding is quite narrow. We must uphold the Board's factual findings if they are supported by substantial evidence in the record as a whole." *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1551 (10th Cir. 1996). "As to questions of law, we generally afford the Board's determinations 'great weight,' and uphold [its] determinations if within 'reasonable bounds.'" *NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993) (internal citations omitted).

---

[4] Even though the Midnight Rose "does not oppose" enforcement of the Board's order as to the Section 8(a)(1) issues (Petitioner's Reply Br. at 1), it appears from the briefs that no portion of the order has been enforced.

> We do not, of course, retry the proceedings before the Administrative Law Judge or those before the Board. We do not weigh the credibility of one witness against another and we do not search for contradictory inferences. We are not authorized to make contrary alternative inferences from the record evidence where there is substantial evidence to support the Board's determination. We do not have a broad discretion to overturn the NLRB on factual issues. Indeed our authority is narrower than the Board's in its consideration of the findings of the Administrative Law Judge.

*NLRB v. Wilhow Corp.*, 666 F.2d 1294, 1299 (10th Cir. 1981) (internal citation and footnote omitted).

This Court "may not overturn a Board decision just because we might have decided the matter differently; rather, our function is to ascertain that 'the Board acts within reasonable bounds and that the supporting evidence is truly substantial.'" *Ready Mixed Concrete Co.*, 81 F.3d at 1551 (citation omitted). "Substantial evidence is more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Meinholdt Mfg., Inc.*, 451 F.2d 737, 738 (10th Cir. 1971).

The crux of the evidentiary dispute in this case is whether the Midnight Rose discharged Ostler because of her union activities or for a legitimate reason unrelated to such protected conduct. Due to the narrow nature of our review and deference to the Board's findings, we must affirm the Board's decision, even though we find the dissent persuasive.

Because the Midnight Rose offered a non-discriminatory reason for Ostler's discharge, we must review the evidence in light of the test developed by the

NLRB for analyzing "dual motivation" cases. *Ready Mixed Concrete Co.*, 81 F.3d at 1550. "An employer violates 29 U.S.C. §§ 158(a)(1), (a)(3) by discharging an employee for engaging in Union activity." *Monfort, Inc. v. NLRB*, 965 F.2d 1538, 1547 (10th Cir. 1992). As the First Circuit noted in *NLRB v. Wright Line:*

> [The Act] imposes a prohibition on employers which is simple to state but often difficult to apply in practice: they may not discharge an employee because of his union activity; but they may and should apply their usual rules and disciplinary standards to a union activist just as they would to any other employee. Hence, in a given discharge case it must be decided whether the employer acted because of the employee's union affiliation, or whether he acted because of some factor unrelated to the employee's union status.

662 F.2d 899, 901 (1st Cir. 1981).

The NLRB enunciated a two-part test for determining whether an employer's discharge is violative of the Act: first, the General Counsel is required to make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in an employer's decision to discharge an employer. If this is established, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct. *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980). This test was adopted by the First Circuit in *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981), and approved by the United States Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393 (1983). It has been adopted and

consistently applied by this Court. *Monfort, Inc.*, 965 F.2d at 1540; *MJ Metal Prods., Inc. v. NLRB*, 267 F.3d 1059, 1065 (10th Cir. 2001).

Here, the ALJ found the General Counsel met his burden of establishing a prima facie case, a conclusion with which the Board agreed, and which the Midnight Rose does not now dispute. We thus turn to the Board's finding that the Midnight Rose "failed to meet its *Wright Line* burden of establishing that it would have terminated Ostler for the asserted reason — theft — even in the absence of her union activity." *Midnight Rose*, 343 N.L.R.B. at 2; *see also* App. at 17. One member of the Board dissented, and this dissent is the linchpin of the Midnight Rose's appeal.

The undisputed evidence is that Ostler and Hendricks received permission to temporarily switch jobs. The first day they implemented this shift, November 17, 2001, Ostler clocked in as a cocktail waitress. For all subsequent shifts, the time clock defaulted to Ostler's usual job code as a bartender, whether Ostler worked as a bartender or cocktail waitress. Hendricks never clocked in at the higher-paying bartender rate and continued to be paid as a cocktail waitress. Ostler knew she was being overpaid and did not bring that to management's attention. Hendricks was not aware she was being underpaid until she received notification from the Midnight Rose.

Disputed is whether Moon told Ostler and Hendricks to clock in with the appropriate job code each time they switched. Ostler and Hendricks said Moon

made no mention of this requirement when approving the switch; Moon testified she emphasized this to them. The ALJ discounted Moon's testimony, noting "her strong backing of [the Midnight Rose's] efforts to blunt union organizing." (App. at 15-16.) In addition, the judge found Ostler's failure to clock in using the correct job code to be "an honest mistake" (App. at 15) and consistent with her stated belief that the time clock would retain the last code entered.

"Credibility determinations are particularly within the province of the hearing examiner and the Board, and these are generally entitled to affirmance on review." *Wilhow Corp.*, 666 F.2d at 1299-1300. "When, as here, the NLRB has referred a matter to an administrative law judge, '[his] credibility resolutions deserve great weight to the extent they are based on testimonial evidence of live witnesses and the hearing judge has had the opportunity to observe their demeanor.'" *MJ Metals Prods.*, 267 F.3d at 1065 (citation omitted); *see also Cardiovascular Consultants of Nevada, MI*, 323 N.L.R.B. 67 n.3 (1977) ("The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect."). Absent "extraordinary circumstances," this Court will not substitute its view of credibility for that of the ALJ. *Presbyterian/St. Luke's Med. Ctr. v. NLRB*, 723 F.2d 1468, 1477 (10th Cir. 1983). The Seventh Circuit has said "extraordinary circumstances" include "a clear showing of bias by the ALJ, an utter disregard for uncontroverted sworn

testimony or the acceptance of testimony which on its face is incredible." *Carry Cos. of Ill., Inc. v. NLRB*, 30 F.3d 922, 928 (7th Cir. 1994). While we might have reached a different conclusion, there are no extraordinary circumstances in this case that would permit us to substitute our view of credibility for that of the ALJ and the Board.

In addition to credibility determinations made in favor of the General Counsel's case,[5] the Board concluded the Midnight Rose failed to carry its burden in establishing "that at the time it discharged Ostler, it had a reasonable belief that she committed theft, *i.e.*, that she knowingly took bartender base wages without the [Midnight Rose's] authorization, or by deception, during those times that she worked as a waitress" and that it "acted on that belief in taking the adverse employment action against [her]." *Midnight Rose*, 343 N.L.R.B. at 3. The Board found "Ostler engaged in no deception." The Midnight Rose's "failure to conduct a fair investigation" demonstrated the Midnight Rose did not act on its belief that Ostler committed theft in discharging her. *Id.*

Undisputed facts are: Ostler and Hendricks were given permission to switch

---

[5] In refuting a challenge to an ALJ's "tendency [] to find the testimony of the unionizing employees more believable and forthright," we noted "[m]erely because the Administrative Law Judge believed the employee's story does not furnish reasons to overturn his credibility determinations. In order for the court to accept the findings of the Administrative Law Judge it is sufficient for this court that the judge advanced plausible reasons for his credibility findings." *Wilhow Corp.*, 666 F.2d at 1300 (internal quotations and footnote omitted).

jobs; Ostler clocked in correctly for her first shift as a cocktail waitress; Hendricks never clocked in as a bartender; and Ostler continued to switch between jobs over the next several months. The record also reflects Moon and Wenschlag decided on February 12 to terminate Ostler; she was notified of her termination by Rick Pratt on February 13; and it was only after she alleged her termination was motivated by her union activities that additional meetings were scheduled with other management personnel to discuss the termination. This evidence, coupled with the timing of Ostler's discharge and the Midnight Rose's commission of other unfair labor practices, is sufficient to support the Board's decision. Ostler was discharged less than one month after the union notified the casino about the initiation of organizing activities and shortly after management began suspecting Ostler of being an organizer. *See MJ Metal Prods.*, 267 F.3d at 1065 (In evaluating whether an employer has carried its burden, the Board "may consider factors such as the employer's knowledge of the employee's union activities, the employer's commission of other unfair labor practices, the timing of the employer's action, and the credibility of its explanation of the reasons for the discharge."); *Wilhow Corp.*, 666 F.2d at 1302 ("Certainly the timing of events is an important factor in determining the validity of an inference that there has been a discriminatory firing.").[6]

---

[6] With respect to "the employers' commission of other unfair labor practices," *MJ Metal Prods.*, 267 F.3d at 1065, the ALJ found the Midnight Rose violated Section

We find ourselves more persuaded, however, by the dissent, which would have found the Midnight Rose acted on a reasonable belief that Ostler was engaged in misconduct. Ostler admitted she knew she was being overpaid, but "made no effort to correct the situation," although she freely admitted she would have brought any underpayment to management's attention. *Midnight Rose*, 343 N.L.R.B. at 5 (Schaumber, dissenting). It is undisputed she demonstrated she knew how to clock in properly; there is evidence she even bragged "she was probably the best" at clocking in. (R. Vol. I at 247.) Her explanation for her failure to clock in as a cocktail waitress (with its corresponding lower rate of pay) for forty-seven shifts over a three-month period of time, *i.e.* that she believed the time clock retained the last code entered, was offered for the first time at the hearing, four months after her termination, a delay which discounts the credibility

8(a)(1) by interrogating employees about union activities, threatening employees with job loss for seeking union representation, and soliciting an employee to spy on Ostler's union activities. All of these violations occurred shortly before Ostler's discharge. The Midnight Rose did not file exceptions to the ALJ's findings in this regard and they were upheld by the Board. *Midnight Rose*, 343 N.L.R.B. at 1, 4. Now, however, the Midnight Rose contends these violations are "irrelevant and tangential" to the issue at hand, and should not be considered in evaluating whether as an employer it has proven its affirmative defense. (Petitioner's Reply Brief at 2 & 2 n.1.) This Court has deemed it appropriate for the Board to consider a discharge in the context of *all* of an employer's actions, *MJ Metal Products*, 267 F.3d at 1065, which in this case include the violations of Section 8(a)(1). "[T]hose findings remain in the case, and we are free to draw upon them to put the contested violation - [the employee's] firing - into proper perspective." *E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 41 (1st Cir. 2004); *see also NLRB v. Clark Manor Nursing Home Corp.*, 671 F.2d 657, 660 (1st Cir. 1982) ("We note the obvious, that [the unchallenged activities] do not disappear by not being mentioned in a brief. They remain, lending their aroma to the context in which the [remaining] issues are considered.").

of her explanation. *Midnight Rose*, 343 N.L.R.B. at 5 (Schaumber, dissenting). Further discounting this explanation is the fact Ostler shuttled back and forth between cocktail waitress and bartender during the months of November through early February. "If Ostler assumed the machine would retain the last-entered job classification, cocktail waitress, however, why would she fail to override the machine again to reflect when she working the higher-paid bartender position?" *Id.* at 5-6.

Finally, the Midnight Rose re-evaluated its decision to terminate Ostler once she alleged her termination was discriminatorily motivated. While the evidence is clear the initial decision was made on February 12, and that Ostler was told she was terminated on February 13, the record is equally clear that management personnel met with Ostler twice, decided to think about their actions over the weekend, and compensated Ostler for that weekend. This evidence strongly supports the dissent's position that the Midnight Rose "established by a preponderance of the evidence that it would have terminated Ostler for theft even in the absence of her protected concerted activity," and therefore her discharge was lawful. *Id.* at 7.

Ultimately, the issue is not whether the Midnight Rose "could have discharged [Ostler] for her actions, but whether it *would* have done so regardless of her union activities." *Presbyterian/St. Luke's Medical Center*, 723 F.2d at 1480. But for the narrow constraints which limit our review, we would answer

this question in the affirmative. Nevertheless, we will not "retry this case on a cold record." *Ready Mixed Concrete Co.*, 81 F.3d at 1552.

2. Enforcement of the order

The Midnight Rose did not challenge the findings regarding the Section 8(a)(1) violations (threatening and interrogating employees with respect to union organizing activities). Therefore, the NLRB is entitled to summary enforcement of its order as to those aspects of this case. *Monfort, Inc.*, 965 F.2d at 1540 n.1.

With respect to the finding that the Midnight Rose violated Section 8(a)(3) and (1) by discharging Ostler, we hold the Board correctly interpreted and applied the law, and its factual findings are supported by substantial evidence in the record as a whole. Thus, enforcement of the order is granted. *Presbyterian/St. Luke's Medical Center*, 723 F.2d at 1471.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

-16-