F I L E D
United States Court of Appeals
Tenth Circuit

JUL 11 2000

PATRICK FISHER
Clerk

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

WEBCO INDUSTRIES, INC.,

Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD,

Respondent,

Nos. 98-9551 & 99-9502

THE UNITED STEELWORKERS OF
AMERICA, AFL-CIO-CLC,

Intervenor.

ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
(Nos. 17-CA-19047 & 17-CA-19120)

David E. Strecker (with James E. Erwin on the briefs) of Strecker & Associates,
Tulsa, Oklahoma.

Richard A. Cohen (with Frederick L. Feinstein, Linda Sher, and John D.
Burgoyne on the briefs) of the National Labor Relations Board, Washington D.C.

Arlus J. Stephens (with Richard J. Brean on the briefs) of United Steelworkers of
America, AFL-CIO-CLC, Pittsburgh, PA.

Before **EBEL** , **HOLLOWAY** , and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

Webco Industries, Inc. ("Webco" or the "company") petitions for review of a National Labor Relations Board ("NLRB" or "the Board") decision and order finding that Webco violated sections 8(a)(1) and (3) of the National Labor Relations Act ("the Act"). [1] The Administrative Law Judge ("ALJ") found that Webco had violated those sections and the Board affirmed with slight modification. The Board has applied for enforcement of its order. We exercise jurisdiction pursuant to 29 U.S.C. § 160(e) and (f) and we grant the NLRB's cross-application for enforcement.

## I. BACKGROUND

Webco operates a plant in Sand Springs, Oklahoma that manufactures and distributes steel tubing. The company employs approximately four hundred non-

---

[1] 29 U.S.C. § 158(a).
> It shall be an unfair labor practice for an employer
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
> . . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

union employees at the plant, which operates seven days per week, twenty-four hours per day.

All of the events involved in this case occurred in March 1997. On March 1, 1997, several employees engaged in various activities that allegedly violated Webco's "non-solicitation and distribution of literature policy" ("non-solicitation policy") by unlawfully soliciting on behalf of the United Steelworkers of America (the "Union"). Webco vice president and plant manager, Bill Obermark, imposed disciplinary actions in response to each of the employees' activities. Also on March 1, as part of the company's response, certain Webco representatives made statements regarding potential union representation, and on March 2, Webco's President made two speeches regarding the union's organizational efforts. Finally, on March 15, Webco terminated one of the employees for his alleged involvement in garnering union support during worktime on March 1 and for his subsequent disruptive and threatening behavior.

The controversy here concerns the Board's finding of the following violations, which we present in the order in which we shall examine them:

(1) Webco violated §§ 8(a)(1) and 8(a)(3) of the Act through selective discriminatory application of its non-solicitation policy and Mr. Obermark's subsequent discipline of two employees; Webco also violated § 8(a)(1) by

suspending and/or discharging two other employees after the events of March 1 and 15. Specifically, the involved employees were:

(a) Stephanie Almy, who was suspended for violating the non-solicitation policy, but was subsequently reinstated to her former position with backpay;

(b) Brad Powell, who received a written warning for violation of the non-solicitation policy;

(c) Charles Williams, who was suspended for violation of the non-solicitation policy; and

(d) Charles Thornton, who received a written warning for violation of the non-solicitation policy; and who was later discharged, purportedly for his use of racial slurs and his overly aggressive threats of physical harm.

(2) Webco violated § 8(a)(1) when it failed to fully repudiate its conduct with respect to Ms. Almy's suspension because after Webco discovered the suspension was in error, the company failed to adequately publish its repudiation as required by the Act, which would have served to assure employees that the company would no longer interfere with the exercise of their § 7 rights;

(3) Webco President Dana Weber's speech to Webco employees violated § 8(a)(1) of the Act because it "constituted an implicit threat" to take disciplinary

-4-

action against the "listening employees if they, too, should engage in protected conduct on behalf of the Union." In re Webco Indus., Inc., 327 N.L.R.B. No. 47 at 2 (Nov. 30, 1998) (hereinafter "Order"); and

(4) Webco supervisor and shift business manager Dan Marrs unlawfully threatened employees in violation of § 8(a)(1) by stating that if the employees chose the Union as their bargaining representative, negotiations with the company would start from "ground zero." Id.

Webco challenges each of the above findings of the Board.[2] The company also challenges the Board's deference to the ALJ's "contradictory" credibility findings and further contends that the record lacks substantial evidence to support the ALJ's factual findings. We shall consider each contention in turn.

## II. DISCUSSION

### A. Standard of Review

Section 10(e) of the Act, 29 U.S.C. § 160(e), states that fact findings made by the Board are conclusive, "if supported by substantial evidence on the record considered as a whole." Our review is thus a narrow one, see NLRB v. Dillon

---

[2] The Board also found that Webco had lawfully terminated one employee, Mr. Frank Hubbard, and the Board adjudicated an unlawful surveillance of a union meeting charge in favor of Webco. These two charges are not at issue in the proceeding.

Stores , 643 F.2d 687, 690 (10th Cir. 1981), and we accept the NLRB factual findings unless we "'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" Phelps Dodge Mining Co. v. NLRB , 22 F.3d 1493, 1496 (10th Cir. 1994) (quoting Universal Camera Corp. v. NLRB , 340 U.S. 474, 488 (1951)).

"The 'substantial evidence' test itself already gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that could satisfy a reasonable factfinder." Allentown Mack Sales & Serv. v. NLRB , 118 S. Ct. 818, 828 (1998). Furthermore, "[i]f the Board has made a 'plausible inference from the evidence' we may not overturn its findings, although if deciding the case de novo we might have made contrary findings." Weather Tamer, Inc. v. NLRB , 676 F.2d 483, 487 (11th Cir. 1982) (quoting Sturgis Newport Bus. Forms, Inc. v. NLRB , 563 F.2d 1252, 1256 (5th Cir.1977)). We retain the responsibility to assure that the Board has acted within its bounds and "[w]hether on the record as a whole there is substantial evidence to support [the] agency['s] findings." Universal Camera , 340 U.S. at 491.

As to the credibility determinations of the ALJ, the determination of credibility is "particularly within the province of the hearing examiner and the

Board." NLRB v. Wilhow Corp., 666 F.2d 1294, 1299 (10th Cir. 1981); see NLRB v. Dover Corp., 535 F.2d 1205, 1209 (10th Cir. 1976). The ALJ's credibility resolutions deserve great weight "to the extent they are based on testimonial evidence of live witnesses and the hearing judge has had the opportunity to observe their demeanor." Eastern Eng'g & Elevator Co. v. NLRB, 637 F.2d 191, 197 (3d Cir. 1980). The Board found "no basis to reverse the [ALJ's credibility] findings," Order at 1 n.2, with one exception.

In this case, the ALJ "advanced plausible reasons for his credibility findings," and we accept them. Wilhow Corp., 666 F.2d at 1300; see In re Webco Indus., No. 17-CA-19047 at 18-19, 24-25, 28, 30-32 (N.L.R.B. May 4, 1998) (hereinafter, "ALJ Decision"). We are satisfied that the reasons furnished by the Board for its credibility determinations are not inherently contradictory. Consequently, we must uphold the Board's conclusions reached on the basis of those determinations.

**B. Disciplinary Actions Imposed for Violations of the Non-Solicitation Policy**

**1. The Non-Solicitation Policy**

On its face, Webco's non-solicitation policy was valid. It prohibited all activities of solicitation or distribution of literature on company property by non-

employees. The policy also prohibited employees from soliciting or distributing literature during working time and in working areas. Violation of the policy subjected employees to discipline up to and including discharge. The policy on its face is not under challenge. Rather, it is challenged as applied.

Webco neither contests that it disciplined the four employees, nor that it administered this discipline in response to the employees' union-related activities. Webco argues that it was privileged to discipline the employees because their actions in furtherance of garnering union support violated the company's non-solicitation rule.

Webco maintains its non-solicitation policy was valid, benign, and consistently enforced. However, the Board adopted the ALJ's finding that the non-solicitation policy was selectively enforced with discriminatory intent. The Board did not acknowledge the ALJ's consideration that Webco did enforce the policy against certain religious proselytizing and selling of commercial products. Because we do not discredit the ALJ's factual findings, we will weigh this conclusion in our review.

There is uncontroverted testimony that employees solicited sales of phone service products, children's affinity group sale items (such as sausages, candy and cookies) as well as participation in employee recreational activities (such as sporting event pools, fantasy football, and baseball leagues). These activities

were commonplace at the plant. Although there is evidence that Webco invoked its non-solicitation rule to terminate some kinds of religious proselytizing and commercial product sales, the above-listed instances were commonly countenanced by Webco, including Mr. Obermark, and involved supervisors, including supervisor Dennis Coldiron.

In response, Mr. Coldiron and other supervisors presented conflicting testimony as to Mr. Coldiron's participation, but not regarding the existence of workplace solicitation. Mr. Obermark testified that he was unaware of any solicitation or participation in office pools, but the ALJ found that testimony "absurd." ALJ Decision at 19. He "explicitly f[ou]nd the conduct occurred and that [Webco]'s agents, particularly Obermark, knew or should have known of it." Id.

The ALJ believed the employees' recitals of the events. "Merely because the ALJ believed the employee's story does not furnish reason to overturn his credibility determinations." Dillon Stores, 643 F.2d at 692. As noted above, we accept the ALJ's credibility findings and we agree that there is substantial evidence that supports finding that Webco enforced its non-solicitation policy in a discriminatory manner, allowing some kinds of solicitation but prohibiting union solicitation.

## 2. Webco's Motivation

Under Webco's thesis, it presumed the non-solicitation policy to be valid on its face and in its enforcement. As such, the company argues it acted under a good faith belief that the subject employees committed an act or acts of misconduct in the course of the violation of the non-solicitation policy. Webco contends that even if the employees were not in fact guilty of that conduct, we must consider Webco's good faith belief in and enforcement of the non-solicitation policy.

As to the propriety of the disciplinary actions imposed, Webco argues that the employees must establish that Webco acted with anti-union animus. Webco also contends that the events of March 1 created a chaotic situation not before seen at the plant. The company avers that the significant disruption of an important project through the employees' inattentiveness to their jobs warranted an immediate investigation of and response to the activities.

Webco's contention that we must consider its motivation is flatly inconsistent with NLRB v Burnup & Sims, Inc., 379 U.S. 21, 22-23 (1964), in which the Supreme Court spoke to the requirement of a bad faith showing under § 8(a)(1). In Burnup, the Court expressed concern about "the example of employees who are discharged on false charges" and the potential "deterrent effect on other employees." Id. at 23. The Court held that an employer violates §

8(a)(1) if (1) "the discharged employee was at the time engaged in a protected activity"; (2) "the employer knew it was such"; (3) "the basis of the discharge was an alleged act of misconduct in the course of that activity"; and (4) "the employee was not, in fact guilty of that conduct."    Id. at 23.  Burnup requires no showing of the employer's anti-union hostility for the commission of an unfair labor practice.

Webco contends that the Supreme Court's holding in     Burnup is no longer good law, and that a revised reading of     Burnup will insulate the company from liability.  Webco emphasizes that our application of      Burnup must harmonize various changes in employment and labor law over the past three decades, specifically that the employees generally must establish proof of discriminatory intent.  See Aplt's Br. at 37.  The company relies on the vitality of Justice Harlan's separate opinion in     Burnup , where Justice Harlan encouraged the Board to ignore an employers's motive only in a "rare situation."     Burnup , 379 U.S. at 25 (Harlan, J. concurring in part and dissenting in part).

Webco also suggests that the Supreme Court's holdings in      NLRB v. Brown , 380 U.S. 278 (1965), and    American Ship Building Co. v. NLRB    , 380 U.S. 300 (1965), modified  Burnup .  This contention is misplaced.  Unlike the present case, Brown and American Ship Building   concerned employer lockouts.  The Court held that these lockouts were not unfair labor practices, in part because the employer was not motivated by anti-union animus.  However, the     Brown Court,

-11-

relying on Burnup, noted that an employer action that is "demonstrably destructive of employee rights and is not justified by the service of significant or important business ends" constitutes an unfair labor practice, notwithstanding the employer's motivation. Brown, 380 U.S. at 282. This reliance upon Burnup hardly suggests the overruling of Burnup's holding that motivation is irrelevant for mistaken employee discipline in the context of protected activities.

Given Burnup's continued vitality, Webco's assertions are unconvincing as they apply to the selective enforcement of Webco's non-solicitation policy in response to union solicitation. As discussed above, the record indicates that Webco knew, or should have known, that the non-solicitation policy was repeatedly violated by employees and supervisors alike. Whether Webco acted with anti-union animus when it selectively enforced the non-solicitation policy is irrelevant. [3] Our review of the incidents is best viewed on an individual employee basis.

### 3. Webco's Response

a. Stephanie Almy

---

[3] Because we agree with the Board and the ALJ that Webco selectively enforced its non-solicitation policy, we need not engage in an analysis of Webco's response to veritable policy violations under Hammary Manufacturing Co., 265 N.L.R.B. 57, 57 n.4 (1982), as suggested by the ALJ. We note, however, that an application of Hammary yields the same result.

Apparently, Mr. Obermark was informed that Ms. Almy was seen handing out union authorization cards, although Ms. Almy denied doing so during work time. Mr. Obermark suspended Ms. Almy, who received a written consultation form that indicated that she had been "[c]onducting solicitation in violation of company regulations" and was directed to "discontinue" such conduct. Rec. vol. I at GC Ex. 2.

Webco reinstated Ms. Almy with full backpay when Mr. Obermark concluded Ms. Almy had not violated the non-solicitation rule. [4] Under a straightforward application of Burnup, substantial evidence supports the ALJ's conclusion that Ms. Almy was unfairly disciplined for conduct that never occurred, in violation of § 8(a)(1). See 379 U.S. at 22-23.

b. Charles Williams

Mr. Williams received a suspension, pending further investigation, upon Mr. Obermark's belief that on March 1, Mr. Williams had solicited two

---

[4] We acknowledge the dissenting member of the Board's concern that the reliance on In re Passavant Memorial Area Hospital, 237 N.L.R.B. 138 (1978), may discourage prompt relief by an employer. Although the requirement that a company repudiate its improper suspension publicly may prolong remediation, that is, hopefully, not always the case; in any event, we agree with the Board that in this case, without public repudiation, there is "no assurance that the coercive effects of the initial wrongdoing will not linger in the workplace." Order at 2.

employees' union cards during work time. When Mr. Obermark confronted Mr. Williams, he also gave him an employee consultation form that Mr. Williams had been "[c]onducting solicitation in violation of company regulation." Rec. vol. I at GC Ex. 1. Mr. Williams testified that he did not solicit employees during work time, but that he did speak to two employees as to whether they had made up their minds regarding union support, and that he mentioned the union to two other employees in the lavatory.

On March 15, two weeks into Mr. Williams' suspension, Webco determined that Mr. Williams had solicited at least one employee during work time. Webco adjusted the discipline to a three-day suspension, reinstated Mr. Williams and gave Mr. Williams backpay for the extraneous suspension period.

Applying the Burnup rule as above, we agree that the punishment imposed upon Mr. Williams for conduct that did not occur, violated section 8(a)(1) of the Act.

c. Brad Powell

A similar analysis applies to Brad Powell's single conversation with another employee on March 1. Mr. Obermark testified that Mr. Powell abandoned his work post and attempted to solicit other employees from other work stations during work time. In response, he received written warnings for "[c]onducting

-14-

solicitation in violation of company regulations" and directing him to "discontinue" the conduct. We affirm the Board's determination that Webco violated §§ 8(a)(1) and (3) in this regard.

### d. Charles Thornton

#### (i) Events of March 1

Mr. Thornton received a written warning, a suspension, and ultimately a discharge, in part for allegedly violating the non-solicitation rule on March 1, and in part for other conduct occurring on March 14 and 15, as more fully explained below. Mr. Obermark testified that he was informed that Mr. Thornton had been involved in a March 1 solicitation of a reluctant employee. Mr. Thornton's testimony vehemently disputes this allegation. On March 1, Mr. Thornton received a written warning similar to those issued to Ms. Almy and Mssrs. Williams and Powell. Mr. Thornton's personal notation on the form also vehemently disputed the allegation.

The ALJ generally believed Mr. Thornton's recital of the events. As to the March 1 events, the ALJ ultimately determined that Mr. Thornton was a credible witness and that Mr. Obermark was not. We defer to these findings.

Applying the Burnup rule to the March 1 events, under which Mr. Obermark's good faith beliefs as to Mr. Thornton's conduct are immaterial, we

agree with the Board that Webco violated § 8(a)(1) when it issued the written warning to Mr. Thornton without credible evidence that a violation of the non-solicitation policy occurred.

### (ii) Events of March 14 and 15

There is conflicting testimony as to the events that occurred on March 14 and March 15. The events occurred in Webco's break room when employees Thornton, Mark Sparks, and Everett Moton were present. The uncontroverted evidence indicates that upon Mr. Thornton's inquiry as to Mr. Sparks' interest in the union, Mr. Sparks took or received a card and immediately tore it up and threw it in the trash in front of Mr. Thornton.

According to testimony from Mr. Moton, Mr. Thornton pressured Mr. Sparks to vote for the union, and then used a racial slur to describe Mr. Sparks. Rec. vol. III at 520. Mr. Sparks reacted and twice asked Mr. Thornton to repeat the epithet, at which point Mr. Thornton stated he said "you're dumb and ignorant." Id. at 521; 522-23. As Mr. Moton was leaving the break room, he observed Mr. Thornton approach Mr. Sparks and invite him outside for an altercation. Mr. Thornton then put his hands on Mr. Sparks' shoulder, but according to Mr. Moton, Mr. Thornton was "goofing around." Id. at 525.

Mr. Sparks testified that Mr. Thornton had not previously used the epithet to describe him, but did use it on March 14. See id. at 508; 510; 513-14. He also recalled that Mr. Thornton was approximately ten feet from him when he invited Mr. Sparks "outside." Id. at 509. Mr. Sparks' testimony indicated Mr. Thornton "did not have his arm around me" and was not "goofing around" when Mr. Thornton invited Mr. Sparks outside. Id. at 512.

Mr. Thornton testified that his invitation to beat up Mr. Sparks was met by several rejoinders, and that the entire exchange was in a humorous vein. He denied using the racial epithet.

After receiving a report about the incident from Mr. Sparks, Mr. Obermark called Mr. Thornton in for a meeting. Mr. Obermark testified that he told Mr. Thornton that Webco had received "reports that you have been threatening people, telling them to come outside so you could kick their ass, [sic] and you've been using racial slurs." Id. vol. II at 450-51. Mr Thornton apparently denied the allegations. Mr. Obermark gave Mr. Thornton a written consultation form that suspended Mr. Thornton pending further investigation. Mr. Thornton indicated his assiduous disagreement with the events as described on the form.

Mr. Thornton's testimony indicates that he did not recall Mr. Obermark specifying the charges against Mr. Thornton. He reconfirmed his denial of the use of racial epithets.

-17-

Mr. Obermark testified that on March 15 he initiated an investigation regarding Mr. Thornton. He testified that Mr. Thornton had apparently asked employee Shane Sartin to join the union; the requests continued despite Mr. Sartin's evident reluctance. Mr. Sartin reportedly told Mr. Obermark that Mr. Thornton was very coercive during these requests. Mr. Obermark also interviewed Messrs. Sparks and Moton regarding the events and language use in the break room on March 14. The company determined it would discharge Mr. Thornton, based on his coercion of Mr. Sartin, his "attitude," the "racial slur," the "shouting match" in the break room, and the "threat to do bodily harm" to Mr. Sparks. Rec. vol II, at 478; vol. I at GC Ex. 8. When the Sartin conversations were disputed, Mr. Obermark testified that Mr. Thornton would have been discharged even if the conversations with Mr. Sartin had not taken place.

The remaining unfair labor practice charges concerning Mr. Thornton's discharge consist primarily of the conflicting testimony we have summarized above. As to the events of March 14 and March 15, in addition to his continued questioning of Mr. Obermark's credibility, the ALJ found Messrs. Moton and Sparks to be far less convincing and less forthright on the stand than Mr. Thornton. The ALJ provided a detailed account as to the rationale behind his determinations. As noted above, the determination of credibility is "particularly within the province of the hearing examiner and the Board." Wilhow Corp., 666

F.2d at 1299; see Dover Corp., 535 F.2d at 1209. Even if the ALJ appears to consistently "side" with the employees' story, this "does not furnish reason to overturn his credibility determinations." Dillon Stores, 643 F.2d at 692. We thus agree with the Board that Webco's conduct violated § 8(a)(1) of the Act.

## C. Webco's Threats and Comments on Union Organizing

"[A] reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." NLRB v. Gissell Packing Co., 395 U.S. 575, 620 (1969). We also defer to the Board's judgment regarding the coercive nature of the conduct in question. See id.; Manna Pro Partners, v. NLRB, 986 F.2d 1346, 1351 (10th Cir. 1993).

### 1. President Weber

On March 2, the day following the suspension of Ms. Almy, Mr. Thornton and another employee and the issuance of warnings to two other employees, President Weber convened two plantwide meetings during which she gave similar speeches regarding the union's organizational efforts. As the ALJ noted:

> She also expressed the view of the Respondent that a union was not necessary or desirable at the facility. Referring to the five disciplined employees, she testified that she told the groups that the Union was supposed to warn employees not to violate the Respondent's no

solicitation policy. She therefore concluded, she told employees, "so, either the Union failed to warn them or encouraged them to violate the policy." She told the employees that if, in fact, the Union had either intentionally not warned the employees or had suggested that that they engage in activities in contravention of the policy, that would mean that the disciplined employees "had been potentially sacrificed by the Union for the benefit of the Union."

ALJ Decision at 8.

In addition, a few employees recalled that President Weber began the speech mentioning the five employees disciplined for violation of the non-solicitation policy, and also recalled that she mentioned that the Union had sacrificed those employees for their union-related activities.

We continue to grapple with distinguishing between an employer's unprotected threats versus protected predictions under Gissell. See 395 U.S. at 617. An employer is free to communicate to its employees any of its general views about unionism or any of its specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). In addition, we recognize that "[w]ords of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1)" of the Act. In re Sears, Roebuck & Co., 305 N.L.R.B. 193, 193 (1991).

The dissenting Board member and Webco emphasize that section 8(c)'s protection extends to an employer's characterization of a union that is based on an

objective fact, and that employees are capable of evaluating such remarks for themselves.  See Order at 5;  see also  Camvac Int'l, Inc.  , 288 N.L.R.B. 816, 820 (1988).  The dissenting Board member states that, at most, Ms. Weber "suggested that soliciting in violation of the no-solicitation rule would lead to adverse employment consequences."  Order at 4.

Even if Ms. Weber's remarks were meant to be confined to violations of the non-solicitation rule, Webco cannot rely upon its selective enforcement of the non-solicitation policy to justify its threats of further adverse employment consequences.  President Weber's statements, unlike the "flip and intemperate" remarks at issue in   In re Sears, Roebuck  , 305 N.L.R.B. at 193, went beyond personal opinion.  The speech came on the heels of an unprecedented staunch imposition of discipline for union-related violations of the non-solicitation rule.  The disciplinary actions taken were severe, and as noted, disproportionate in relation to the violations that actually occurred.  We defer to the Board's judgment regarding the coercive nature of the conduct in question,      see Gissell , 395 U.S. at 617, and agree that Ms. Weber's statements were made in a particularly threatening context and with a particularly threatening quality.      See In re Feldkamp Enters.  , 323 N.L.R.B. 1193, 1200 (1997) (noting "particularly threatening quality" of threats of business closure amounted to unlawful intimidation in violation of the Act).

-21-

**2. Supervisor Marrs**

The Board adopted the ALJ's finding that on or about March 5, in part to respond to the disciplinary actions imposed for alleged union solicitation, Supervisor Dan Marrs made coercive statements to employees regarding the union that violated § 8(a)(1) of the Act. On March 5, Mr. Marrs indicated that if the employees chose union representation, their bargaining position would start from "ground zero." Rec. vol. II at 288-90, 291, 301. The ALJ found the employees' testimony regarding these statements to be credible and that the statements were made to suggest that they would lose benefits if it voted for the union, which violated § 8(a)(1). See ALJ Decision at 27-28; see also Manna Pro Partners, 986 F.2d at 1351 ("An employer violates § [8(a)(1)] by making statements that tend to coerce employees in the exercise of their statutory right to self-organize and engage in activities for the purpose of collective bargaining.").

Undoubtedly, "an employer may properly point out the hazards" of the collective bargaining process. NLRB v. Belcher Towing Co., 265 N.L.R.B. 1258, 1268 (1982), aff'd in part and rev'd in part on other grounds, 726 F.2d 705 (11th Cir. 1984). "Bargaining may start from 'scratch' or 'zero' and the employees may be so informed by their employer prior to an election." Id. It is when the statement exceeds an expression of opinion as to the natural and normal hazards of collective bargaining and "carries with it the seed of a threat that the employer will

-22-

become punitively intransigent in the event the union wins the election," that the statement becomes coercive and unlawful. Belcher Towing Co. , 726 F.2d at 711; see In re Bi-Lo , 303 N.L.R.B. 749, 750 (1991) (indicating that "bargaining from scratch" comments undergo analysis considering whether it is "(1) a lawful statement that benefits could be lost through the bargaining process" or "(2) an unlawful threat that benefits will be taken away and the union will have to bargain to get them back").

Here, the ALJ and Board considered Mr. Marrs' statements to be unlawful in the context of the above-described disciplinary actions that were unfair labor practices and the contemporaneous threats from Supervisor Coldiron and President Weber. The ALJ's determinations that Mr. Marrs' statements violated § 8(a)(1) was proper. See Gissell Packing Co. , 395 U.S. at 617 (stating that "[a]ny assessment of the precise scope of employer expression . . .must be made in the context of its labor relations setting"); In re Taylor-Dunn Mf'g. Co. , 252 N.L.R.B. 799, 800 (1980) (stating that "bargaining from ground zero" or "bargaining from scratch" statements could reasonably be "understood by employees as a threat of loss of existing benefits" prior to bargaining that is unlawful in the absence of other statements regarding the "normal give and take" of collective bargaining), enforced , 679 F.2d 900 (9th Cir. 1982).

### 3. Supervisor Coldiron

The Board did not specifically address the ALJ's findings that Supervisor Coldiron's March 16 activities were similarly unlawful and coercive in violation of § 8(a)(1), but the Board's general deference to the ALJ's credibility findings suggests its affirmation of this violation. In addition, the notice ordered posted by the remedy incorporates remediation measures for Mr. Coldiron's statements.         See Order at 5 (App.).

On March 16, according to testimony of Ms. Almy, Mr. Coldiron apparently suggested to employees that union-supporting employees should quit their jobs, that bargaining with the union would start at the employees' entry pay level and that the union's representation would be "futile."  The ALJ found the Ms Almy's testimony on this matter to be "highly credible" and found Mr. Coldiron's to be the "reverse." ALJ Decision at 28.     After the ALJ made its credibility findings, the Board affirmed the rulings and adopted the ALJ's remediation for this violation. See Order at 5 (App.) ("Notice to Employees Posted by Order of the National Labor Relations Board. . . .  WE WILL NOT tell employees . . . that it would be futile for them to select the Union as their bargaining representative.  WE WILL NOT tell employees who are union supporters to quit their jobs.").  We defer to the findings and we affirm the Board's decision.

## III. CONCLUSION

We do note the apparent existence of some confusion on March 1, 1997. However, we also note the ALJ's competent discussion of the evidence to be considered. As stated throughout our judgment, we cannot review those factual determinations except under our deferential standard. Under that standard it is clear that substantial evidence does exist supporting these determinations and therefore we GRANT enforcement of the Board's order and DENY Webco's petition for review.