**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NATIONAL LABOR RELATIONS
BOARD,

            Petitioner,

    v.

COMMUNITY HEALTH SERVICES,
INC., d/b/a/ MINBRES MEMORIAL
HOSPITAL AND NURSING HOME,

            Respondent.

No. 04-9605 & 05-9523

**APPLICATION FOR ENFORCEMENT AND PETITION FOR REVIEW OF**
**A DECISION OF THE NATIONAL LABOR RELATIONS BOARD**
**(NLRB No. 28-CA-1777)**

Richard A. Cohen, Washington, D.C., for the Petitioner.

Don T. Carmody, Brentwood, Tennessee, for the Respondent.

Before **HARTZ**, **SEYMOUR**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

     Before us are consolidated applications brought by the National Labor

Relations Board to enforce twin orders against CHS Community Health Systems,

Inc. CHS argues that neither order should be enforced, because both stem from

issues already litigated in a prior Board proceeding. Alternatively, CHS contends that the Board's affirmative bargaining order is improper and unwarranted. We reject both claims and AFFIRM.

## I. FACTS

In the summer of 1995, the employees of Mimbres Memorial Hospital and Nursing Home in Deming, New Mexico, voted to organize with the United Steelworkers of America. In July, the Public Employees Relations Board of New Mexico certified the Steelworkers as the exclusive collective-bargaining representative of two distinct labor units within the hospital: Unit A, comprising service, maintenance, and clerical staff, and Unit B, composed of technical and supervising employees.

Not quite a year later, on March 13, 1996, CHS Health Systems, Inc. purchased Mimbres Memorial from Luna County, New Mexico. At the time of purchase, the county and the union had not concluded a collective-bargaining agreement for either labor unit in the hospital. CHS promptly recognized the union and launched its own round of negotiations, which stretched on for four years and a dozen meetings without result.

Meanwhile, CHS proceeded to issue new employment policies without union input or approval. In April 1999, the company handed down a revised absence and sick-leave policy; another iteration for nurses followed later that October. The union protested these unilateral changes in writing, but was

ignored. In September, the union requested that CHS meet to continue negotiations on a collective-bargaining agreement. The parties convened on September 8, 1999, but once more failed to reach consensus. CHS canceled the next scheduled bargaining session on November 2 and despite the union's repeated requests, the parties never met again. Undeterred, the company promulgated a revised policy manual in the spring of 2000, written without union input. When union representatives requested a copy, company officials said "no."

As a result of the company's actions, the union filed a series of unfair-labor-practice charges against CHS with the National Labor Relations Board. Hearings took place on May 2 and 3, 2000. Three months later an administrative law judge found that CHS had violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5), by unilaterally altering the terms and conditions of employment without affording the union prior notice or opportunity to bargain. CHS argued that because the union had adhered to its longstanding policy of refusing to admit new hospital employees into membership until a collective-bargaining agreement had been reached, and because the parties had been without an agreement for nearly four years, the Steelworkers' "majority status" was now in doubt. The ALJ rejected that argument as without factual foundation. He ordered the company to rescind all unilateral changes and generally cease and desist from its illegal practices. Importantly for our case, the ALJ found that CHS had *not* withdrawn recognition of the union by March 2000

and blocked the General Counsel's (belated) attempt to argue that the company had constructively withdrawn recognition. Instead, the ALJ found that while CHS "did in fact fail in its duty to bargain in certain respects, the record is devoid of evidence that [the company] withdrew recognition." *Cmty. Health Sys., Inc., d/b/a Mimbres Mem'l Hosp. & Nursing Home*, 337 NLRB 998, 1005 (2002) (*Mimbres I*). A three-member panel of the National Labor Relations Board (NLRB) affirmed, as did this Court. *N.L.R.B. v. CHS Cmty. Health Sys., Inc.*, 108 Fed. App'x 577 (10th Cir. 2004).

The company, however, did not reopen negotiations with the union. Three days after the ALJ issued its decision, a hospital union representative wrote CHS to request another round of bargaining. CHS did not reply. The union sent letters approximately every two weeks thereafter, through March 13, 2002, to no avail. While the union continued to request an opportunity to negotiate, the company continued unilaterally to alter its employment policies. In January of 2001 CHS modified the shift schedules of its respiratory department workers without prior notice to the union. In April 2001, the company changed the work schedule of union steward Gary Kavanaugh, without prior notice. Also in April, the company reduced the hours of full-time respiratory department employees and hired additional part-time employees to make up the difference, without prior notice to the union. Finally, in June of the same year, the company instituted an employee fingerprint policy. When union steward Kavanaugh refused to comply in protest,

he was suspended. Kavanaugh reported these acts and the company's continued refusal to negotiate, leading the union to file new unfair-labor-practice charges before the Board.

In *Cmty. Health Sys., Inc., d/b/a Mimbres Mem'l Hosp. & Nursing Home*, 342 NLRB 398 (2004) (*Mimbres II*), the Board found that the company's refusal to recognize and bargain with the union following the conclusion of the hearing in *Mimbres I*, its failure to bargain after the final decision in *Mimbres I*, its unilateral changes in employment policies, and its suspension of Gary Kavanaugh all constituted violations of § 8(a)(1) and (5) of the National Labor Relations Act. The Board rejected the company's claim that these charges should have been litigated in *Mimbres I*, noting that the events underlying them occurred after the *Mimbres I* hearing. This time, the Board affirmatively ordered CHS to bargain with the union, as well as to rescind its unilateral changes in hospital employment policy.

Then there is *Mimbres III*. On October 16 and November 7, 2001, and again on January 31, 2002—the latter date after the hearing for *Mimbres II* had already been scheduled—the union sent identical letters to CHS requesting the names, addresses, and seniority dates for all current employees in Units A and B. The company declined to reply. In response to the company's silence, the General Counsel filed a separate complaint before the NLRB on February 28, 2002. The Board rejected the company's contention that the General Counsel's

failure to consolidate the complaints in *Mimbres II* and *III* amounted to prosecutorial abuse, found another violation of § 8(a)(1) and (5), and ordered the company to provide the information sought by the union. *Cmty. Health Sys., Inc., d/b/a Mimbres Mem'l Hosp. & Nursing Home*, 342 NLRB 345, 348-49 (2004) (*Mimbres III*).

The Board petitioned this Court to enforce the order issued in *Mimbres III*; CHS cross-appealed seeking reversal of the order. The Board initially petitioned the District of Columbia Circuit to enforce the order from *Mimbres II*, but that circuit transferred the petition to this Court. We consolidate the two petitions here and decide them together.

## II. DISCUSSION

Two issues require our attention. First, we must decide whether the doctrine announced by the Board in *Jefferson Chemical Corp.*, 200 NLRB 992 (1972), barred it from considering whether CHS unlawfully withdrew recognition from the union after March 2000. If the so-called *Jefferson Chemical* doctrine does apply, then we "cannot conscientiously find that the evidence supporting [the Board's] decision[s] is substantial" and must reverse. *Webco Industries v. NLRB*, 217 F.3d 1306, 1311 (10th Cir. 2000) (internal quotations omitted). Second, provided we conclude that the Board's findings are supported by substantial evidence, we must determine whether the Board properly issued an affirmative-bargaining order in *Mimbres II*.

-6-

## A. *Jefferson Chemical* Preclusion Argument

CHS argues that because the Board in *Mimbres I* considered whether the company had withdrawn recognition from the union, the issue of withdrawal cannot be litigated again in later proceedings. In support of its argument, the company points to the NLRB's 1972 decision in *Jefferson Chemical Corporation*. In that decision, the Board held that where the General Counsel had already once litigated a broad refusal-to-bargain charge, fairness concerns and the interests of administrative economy precluded him from later litigating a related charge that turned on the same set of facts: "[T]he General Counsel is dutybound to investigate all matters which are encompassed by the [original] charge, and to proceed appropriately thereafter." *Jefferson Chemical*, 200 NLRB at 992 n.3. "[M]ultiple litigation of issues which should have been presented in the initial proceeding constitutes a waste of resources and an abuse of our processes. . . ." *Id; see also Peyton Packing Co.*, 129 NLRB 1358 (1961).

The Board has made clear that this restriction is policy-based, not jurisdictional, and is limited to those instances when the General Counsel attempts to litigate "the same act or conduct as a violation of different sections of the Act" or relitigates the "same charges in different cases." *Cresleigh Mgmt., Inc.*, 324 NLRB 774, 774 (1997) (internal quotations omitted) (emphasis removed).

CHS claims that *Mimbres II* and *Mimbres III* fit squarely within the *Jefferson Chemical* prohibition. We fail to see the application. The General Counsel has not attempted in these cases to relitigate claims raised and decided in *Mimbres I*. Though unlawful withdrawal of recognition is a charge made in all three cases, two separate withdrawals are at issue. The General Counsel argued in *Mimbres I* that the company had unlawfully withdrawn recognition of the union on or by March 23, 2000. The Board rejected this argument and found that no withdrawal had occurred. In *Mimbres II* and *III*, the General Counsel has claimed that the company's failure to bargain *after* the decision in *Mimbres I* constituted an unlawful withdrawal of recognition. These are distinct factual scenarios, giving rise to distinct claims.[1] The *Jefferson Chemical* doctrine is inapplicable "because the facts and circumstances giving rise to the . . . allegation did not take place until after the [earlier] case . . . was heard and decided." *New Surfside Nursing Home*, 330 NLRB 1146, 1151 (2000); *see also E.I. du Pont de Nemours & Co.*, 311 NLRB 893, 908 (1993) (employer domination suit not barred by earlier case alleging employer domination because the allegations in the second case occurred months after the trial in the first case began); *Great Western Produce, Inc.*, 299 NLRB 1004, 1009 n.1 (1990) *(Jefferson Chemical* does not

---

[1] The ALJ in *Mimbres II* did note some possible, inadvertent overlap in proof between the withdrawal allegations in *Mimbres II* and *Mimbres I*. She cured the problem by refusing to consider any conduct by either party that occurred before the last *Mimbres I* hearing on May 3, 2000. *Mimbres II*, 342 NLRB at 401.

apply to a claim premised on facts that occurred more than a year after the hearing in the first case closed).

CHS tries to salvage its argument by claiming that the Board's factual findings in *Mimbres I* reveal it lawfully withdrew recognition from the union in November 1999.[2]  Apparently CHS believes that if the withdrawal of recognition in 1999 was lawful, the General Counsel may not argue that the company's withdrawal became unlawful at a later date.  But this argument is misconceived. The Board in *Mimbres I* explicitly found that CHS had not withdrawn recognition as of late March 2000, 337 NLRB at 1005, and this Court is in no position to revisit that factual finding.

---

[2] We note with some irritation that CHS took precisely the opposite position in *Mimbres I*, arguing there that it had not withdrawn recognition of the union "on or about March 23, 2000." Petitioner Br., Addendum at 6, 3-4.  The company argued instead that its *refusal to bargain* was lawful because the union had lost its majority status.  *Mimbres I*, 337 NLRB at 1005.  A refusal to bargain is not synonymous with a withdrawal of recognition.  The company shifted its position in its reply brief to this Court: the company now argues that it did not deny withdrawing recognition in *Mimbres I,* it only denied withdrawing recognition "on or about March 23, 2000."  Reply Br. 10.  According to Respondent's counsel, the company has never denied withdrawing recognition "in the Fall of 1999." *Id*. at 10-11.  This is too clever by half, and anyway, has no legal relevance.  In reaching its conclusion that no withdrawal had occurred by March 2000, the ALJ in *Mimbres I* considered more than the company's actions on a single date.  The judge considered CHS's entire course of dealing with the union: "Although there are in evidence letters from [the union representative] to the Respondent's counsel which went unanswered, there is no evidence that the Respondent in fact withdrew recognition.  [The union representative] testified that he has never received notice that the Respondent was withdrawing recognition." 337 NLRB at 1005.

At oral argument, Respondent's counsel offered a variation on this theme, contending that CHS had *constructively*—and lawfully—withdrawn recognition from the union in the fall of 1999. Counsel placed great weight on the distinction between constructive and actual withdrawal. We note that CHS made no such distinction in its briefing to this Court, so to the extent the distinction makes a difference, CHS has waived the argument. However, we doubt the distinction amounts to much in this case. The Board in *Mimbres I*, *II*, and *III* considered and rejected the argument CHS now offers as to why its "constructive" withdrawal in 1999 was lawful—namely, that the union had lost majority status. *Mimbres I*, 337 NLRB at 1005, *Mimbres II*, 342 NLRB at 401, *Mimbres III*, 342 NLRB at 348-49. CHS complains that the Board in *Mimbres II* and *III* precluded it from offering evidence pre-March 2000 regarding the union's majority status. Even were this true, we fail to see the relevance. Surely if the union had not lost majority status by May 2000, as held in *Mimbres I*, it had not lost it in November 1999, only to regain it later. Given the factual findings in all three cases, if CHS did in fact "constructively" withdraw in 1999, it was unlawful. But the company's actions in the fall of 1999 are not at issue in this appeal. If CHS truly believed it had constructively, and lawfully, withdrawn recognition, it should have made that argument in *Mimbres I*. Its failure to do so will not prevent the Board from considering whether it unlawfully withdrew recognition thereafter.

-10-

CHS was free to contest the Board's conclusions in *Mimbres II* and *Mimbres III* that the withdrawal of recognition after March 2000 was unlawful—but that argument has nothing to do with *Jefferson Chemical*. To be sure, the Administrative Law Judge found, in *Mimbres II*, that "[o]n November 2, 1999, Respondent [CHS] withdrew recognition of the Union." 342 NLRB at 400. She did not, however, make any findings with regard to the withdrawal's lawfulness, as that issue was not properly before her. Instead, she expressly found that CHS *unlawfully* withdrew recognition after March 28, 2000, and she reached that finding relying only on conduct "alleged to have occurred after the conclusion" of *Mimbres I*. 342 NLRB at 401. The claims the ALJ considered and ruled upon, then, were not litigated in *Mimbres I* and are not subject to *Jefferson Chemical* preclusion.

In sum, the Board was not precluded from considering evidence of unlawful withdrawal after March 2000 simply because the company had successfully defeated an earlier charge that it withdrew unlawfully before March 2000. Consequently, the company has not demonstrated that the Board's conclusions were without foundation in the record.

## B. Affirmative-Bargaining Order

In *Mimbres II*, Administrative Law Judge Lana Parke affirmatively directed CHS to bargain with the union. CHS protests the order as an abuse of the Board's authority under the Act. The company urges this Court to craft a new standard of

review for affirmative bargaining orders that would apply only when the employer questions the majority status of the union. In other words, CHS asks us to write a new standard to govern this case. We decline. As we have said time and again, we will "afford substantial deference to the NLRB's selection of an appropriate remedy." *MJ Metal Products, Inc. v. N.L.R.B.*, 267 F.3d 1059, 1067 (10th Cir. 2001) (citing *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969)). Because a remedial bargaining order involves mixed questions of law and fact, we review it for abuse of discretion. *Id.* at 1065.

The Supreme Court has recognized that an affirmative bargaining order is an appropriate response to a company's repeated refusal to negotiate. *Franks Bros. Co. v. N.L.R.B.*, 321 U.S. 702, 704-06 (1944); *N.L.R.B. v. P. Lorillard Co.*, 314 U.S. 512, 513 (1942) (per curiam). The Board in *Mimbres II* found that CHS repeatedly refused to negotiate or to cease making unilateral employment policy changes. We are aware that the District of Columbia Circuit requires the Board to adopt additional findings to support a remedial bargaining order. *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000). Even were we to endorse that circuit's rule, we would find it satisfied here. The *Mimbres II* Board carefully weighed the three factors enunciated by the D.C. Circuit in *Vincent*—the employees' rights, the purposes of the Act, and the viability of alternative remedies—and demonstrated why an affirmative bargaining order is appropriate under each. In view of this explanation and having held that the Board's findings

in *Mimbres II* were supported by substantial evidence, we conclude that the Board's decision to issue a remedial bargaining order did not constitute an abuse of discretion.

### III. CONCLUSION

We **AFFIRM** the judgment of the National Labor Relations Board in both *Mimbres II* and *Mimbres III*.